Curran, Dennis J., J.
This action arises out of the defendants, Indian Harbor Insurance Company’s and XL Specialty Insurance Company’s (collectively, “Indian Harbor”) refusal to provide coverage to the plaintiffs, Market Forge Industries, Inc. (“Market Forge”) and MF Properties, LLC (“MF Properties”), under a Pollution and Legal Liability Insurance Policy (the “Policy”). The plaintiffs have brought actions in breach of contract (Count I) and unfair insurance acts or practices in violation of G.L.c. 93A and 176D (Count III). The plaintiffs also seek a declaratoiy judgment, pursuant to G.L.c. 231A, §1, asking the court to declare that Indian Harbor, under the Policy, must defend the plaintiffs for claims brought against them and pay for and reimburse them for various pollution-related costs (Count II). This matter is now before the court on the plaintiffs’ motion for partial summary judgment on Counts I and II pursuant to Mass.R.Civ.P. 56(c). Indian Harbor cross moves for summary judgment on Count III, however, the parties agreed to stay all motion practice concerning Count III until this court issues judgment on Counts I and II. For the following reasons, the plaintiffs’ motion is DENIED, and summary judgment shall enter in favor of the defendants on Counts I and II.
BACKGROUND
The History of the Site
All of the facts and reasonable inferences from those facts are viewed in the light most favorable to the nonmoving party. Scully v. Tillery, 456 Mass. 758, 767-68 (2010). MF Properties owns a six-acre piece of property located at 35 Garvey Street, Everett, Massachusetts (the “Site”), which various businesses have used for industrial purposes since the early 1900s. MF Properties currently leases the Site to Market Forge who uses the Site and its buildings to manufacture commercial food service, medical and shelving equipment.
In connection with its use of the Site, the plaintiffs sought out, and Indian Harbor issued, a pollution and remediation insurance policy to protect the plaintiffs from liability against future pollution-related claims.[3] The Policy renewed a previous insurance policy for the period of September 2000 to September 2005 (the “2000 Policy”).
In June 2000, in relation to its purchase of the Site, MF Properties hired Paragon Environmental Services to conduct an environmental assessment of the Site. Paragon prepared a fifty-five-page Site Assessment which relied upon, among other things, previous Site assessments issued by other environmental services companies datingbackto themid-1980s (the “Paragon Assessment”). These previous assessments and their material findings are as follows:
(1) Briggs Associates, Inc. (1985)
Identified oil contaminations in three areas of the Site;
Found high levels of volatile organic compounds (“VOCs”), including arsenic, chromium, lead and selenium in the groundwater;
Found acceptable limits of VOCs in the soil; and
Identified concentrations of 1,1,1,-tricholoroethylene[4] above detection limits in groundwater.
(2) Briggs Associates, Inc. (1991)
Determined that the Site was relatively unchanged from the 1985 inspection; and
Concluded that VOCs remained present on the Site.
(3) Briggs Associates, Inc. (1992)
Determined that VOCs were present in three areas on the Site;
■ Found one groundwater monitoring well, “OW-8,” that consistently contained reportable levels of VOCs; and
Reported its findings as related to OW-8 to the Department of Environmental Protection (the “DEP”).
(4) Clean Harbors Environmental Services (1997)
Detected VOCs at levels above reportable concentrations in OW-8, but determined that “no significant risk” existed at the Site; and
Identified VOCs in groundwater samples from two other monitoring wells in insignificant concentrations.
(5) Department of Environmental Protection (1998)
Issued a “Notice of Noncompliance” rejecting the 1997 Clean Harbors opinion and required that further response actions be performed by the current owner of the Site;
Determined that Clean Harbors had provided insufficient information and details regarding *216 the nature and extent of the VOC contamination in the soil and groundwater; and
Required additional Site assessments to ascertain the groundwater flow direction.
(6) Clean Harbors (1999)
Completed further studies and submitted its findings to the DEP;
Determined that OW-8 consistently contained VOCs; and
Concluded that the VOCs at OW-8 are likely the result of an isolated historical incident.
The Paragon Assessment summarized these environmental assessments and recommended that an additional subsurface investigation of the Site be undertaken in the former location of an aboveground storage tank to meet the requirements of the DEP’s 1998 Notice of Noncompliance. Paragon estimated that the subsurface investigation would cost between $10,000 and $15,000. As part of Market Forge’s application for the 2000 Policy, it sent Indian Harbor the narrative portion of the Paragon Assessment. Market Forge did not perform any of the additional subsurface Site investigation recommended by Paragon.
In 2005, Market Forge hired Clean Harbors to conduct another environmental assessment of the Site, focusing on changes since 1999. Clean Harbors found that there was no documented evidence of environmental impacts to the Site soil or groundwater from previous Site use that had not been discussed in the previous reports (the “2005 Clean Harbors Assessment”). With its Policy renewal application in 2005, Market Forge submitted the 2005 Clean Harbors Assessment.
In 2009, Market Forge hired Enstrat, another environmental services company, to conduct an environmental assessment of the Site. Enstrat found VOCs exceeding reportable concentrations on the Site, reported its discovery to the DEP, which ordered the plaintiffs to conduct response actions at the Site.
On May 20, 2009, the plaintiffs filed a claim with Indian Harbor for the contamination Enstrat identified in its 2009 investigation. In March 2010, Indian Harbor concluded that there were five separate pollution conditions at the Site and partially denied coverage for three of these pollution conditions (the “Denied Claims”).
The Policy
The Policy itself provides coverage for pollution legal liability, remediation legal liability and legal defense expenses incurred by the plaintiffs. Specifically, these portions of the Policy provide that Indian Harbor will pay, on behalf of the plaintiffs, for the loss from “Pollution Conditions,” the remediation expenses related to Pollution Conditions, and the legal defense expenses related to liability incurred by the plaintiffs from Pollution Conditions on the Site. This coverage is subject to the requirement that a claim is first made against the plaintiffs, or Pollution Conditions are first discovered, during the policy period.
The Policy defines “Pollution Conditions” as “the discharge, dispersal, release, seepage, migration, or escape of any solid, liquid gaseous or thermal pollutant, irritant or contaminant, including but not limited to smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, hazardous materials, waste materials . . . into or upon land, or structures thereupon, the atmosphere, or any watercourse or body of water including groundwater.”
Indian Harbor’s coverage under the Policy is subject to the “Known Conditions Exclusion.” This exclusion precludes coverage stemming from losses or expenses which “aris[e] from Pollution Conditions existing prior to the inception of this Policy, and reported to any . .. employee responsible for environmental affairs of the [plaintiffs], which were not disclosed in writing to [Indian Harbor] in the application or related materials prior to the inception of this Policy or prior to the location being endorsed onto this Policy.” The Known Conditions Exclusion also states: “Only conditions described in the documents listed in the Known Condition(s) Document Schedule are disclosed to [Indian Harbor].”
DISCUSSION
I. Standard of Review
Summary judgment is appropriate if “viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law.” Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991), citing Mass.R.Civ.P. 56(c). The moving parly bears the burden of affirmatively demonstrating the absence of a triable issue as to its claims, Lev v. Beverly Enters.-Mass., Inc., 457 Mass. 234, 237 (2010), and may satisfy its burden by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the non-moving party has no reasonable expectation of proving an essential element of his case at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The nonmoving party “must set forth sufficient facts showing that there is a genuine issue for trial.” Key Capital Corp. v. M&S Liquidating Corp., 27 Mass.App.Ct. 721, 728 (1989), quoting Mass.R.Civ.P. 56(e). In appropriate cases, summary judgment “may be rendered against the moving party.” Mass.R.Civ.P. 56(c); see Locator Servs. Group, Ltd. v. Treasurer & Receiver Gen., 443 Mass. 837, 851 (2005).
II. Breach of Contract
As an initial matter, interpretation of an insurance policy is a question of law.[5] Harrison v. Nat’l Union Fire Ins. Co., 89 N.Y.2d 308, 316 (1996); see also CheckRite Ltd. v. Illinois Nat’l Ins. Co., 95 F.Sup.2d 180, 188 (S.D.N.Y. 2000). ‘To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is *217 subject to no other reasonable interpretation, and applies in the particular case.” Westview Assocs. v. Guar. Nat’l Ins. Co., 95 N.Y.2d 334, 340 (2000) (citations and internal quotation marks omitted). The test for determining whether an insurance provision is ambiguous “focuses on the reasonable expectations of the average insured upon reading the policy.” Matter of Mostow v. State Farm Ins. Cos., 88 N.Y.2d 321, 326-27 (1996). Exclusionary language is strictly and narrowly interpreted. See Boggs v. Commercial Mut. Ins. Co., 632 N.Y.S.2d 870, 871 (1995).
Here, the Known Conditions Exclusion is sufficiently clear; it is under a heading entitled “Exclusions” and the subheading “Known Conditions.” The exclusion itself is short and concise. Notably, the last sentence of the exclusion states: “Only conditions described in the documents listed in the Known Condition^) Document Schedule are disclosed to the Company.” This provision has “a definite and precise meaning, unattended by danger of misconception in the purpose of the [Policy leaving] no reasonable basis for a difference of opinion.” CheckriteLtd., 95 F.Sup.2d at 189 (“[A] contract is not ambiguous merely because the parties argue for different interpretations” (citations and internal quotation marks omitted)). There are also no terms or words in the Known Conditions Exclusion that are “susceptible to two or more reasonable interpretations.” United States Underwriters Ins. Co. v. AffordableHous. Found., Inc., 256F.Sup.2d 176, 180 (S.D.N.Y. 2003). Therefore, the Policy itself, and specifically the Known Conditions Exclusion, is clear, unmistakable and subject to no other reasonable interpretation.
The central issue in this case is whether Indian Harbor breached the Policy by denying coverage for the pollution-related expenses at the Site, or whether, in the alternative, the pollution-related expenses are precluded from coverage by the Policy’s Known Conditions Exclusion. Under the Policy, in order for the Known Conditions Exclusion to preclude coverage of the Denied Claims, Indian Harbor must establish:
(1) the Denied Claims are “Pollution Conditions” as defined in the Policy;
(2) the plaintiffs knew of these Pollution Conditions, meaning, they were reported to an employee responsible for environmental affairs of the plaintiffs;
(3) the Pollution Conditions existed prior to the inception of the Policy; and
(4) the Pollution Conditions were not disclosed in writing to Indian Harbor, meaning, the Pollution Conditions were not described in the “Known Conditions Document Schedule.”
First, the Denied Claims constitute “Pollution Conditions” as defined by the Policy. The plaintiffs argue that it is premature to determine whether the different areas of contamination around the Site are Pollution Conditions because the sources of the contamination are unknown. Without ascertaining the source of the contamination, the plaintiffs continue, the Known Conditions Exclusion would bar coverage of any discovery of pollution if the pollutant was previously discovered elsewhere on the Site.
The Policy, however, does not support the plaintiffs’ argument. Indeed, the definition of “Pollution Condition” is very broad and the plain language in the Policy does not require tracing a pollutant to its source in order for it to fall into the “Pollution Condition” category. Further, the plaintiffs’ argument is flawed because the Known Conditions Exclusion does not bar the coverage of any discovery of previous pollution on the site. To the contrary, Indian Harbor must be able to establish that the Pollution Condition meets three other Known Conditions Exclusion elements in order to be excluded from Policy coverage.
Second, the Denied Claims also constitute “known” conditions within the meaning of the Policy and are Pollution Conditions that existed before the Policy took effect. Every environmental study conducted at the Site since 1985 reports the presence of metals, VOCs and petroleum at several locations throughout the Site. Although the plaintiffs attempt to distinguish between “reportable” and “nonreportable” levels of contamination, this is not a distinction recognized by the Policy itself. The Briggs, Clean Harbors, Paragon and Enstrat reports establish that there has never been a question as to whether contamination existed at the Site, but rather what the extent of the contamination has been. As Enstrat’s 2009 Assessment noted, there have been recognized environmental conditions such as the “detection of metals, VOCs, and petroleum at varying concentrations in soil and groundwater throughout the [S]ite during previous investigations by others (some at concentrations exceeding DEP Reportable Concentrations)” since the mid-1980s. The parties do not dispute that these Pollution Conditions were reported to David Zappala, the plaintiffs’ representative for environmental affairs.
Finally, and most fatal to the plaintiffs’ motion for summary judgment, these Pollution Conditions were not disclosed to Indian Harbor as required by the Policy. The plaintiffs argue that because they included the Paragon Assessment and the 2005 Clean Harbors Assessment in their applications for the 2000 Policy and the Policy itself, that they adequately disclosed the Pollution Conditions to Indian Harbor. Despite this argument, however, the Policy explicitly requires that in order for Pollution Conditions to be deemed “disclosed” within the meaning of the Policy, they must be included on the “Known Conditions Document Schedule.” Although the plaintiffs argue that Indian Harbor failed to provide them with the “Known Conditions Document Schedule,” and this was a disingenuous attempt to circumvent the extent of coverage for which the plaintiffs were attempting to contract, the plaintiffs had the benefit of an insurance underwriter, the free *218 dom to review the provisions of the Policy, and to ask questions or make changes before agreeing to the Policy’s terms. ELRAC, Inc. v. Ward, 96 N.Y.2d 58, 77-78 (2001) (recognizing freedom of contract). Considering the Known Conditions Exclusion and the Policy as a whole, and the plaintiffs’ express intention of insuring against future pollution-related claims, the unavoidable conclusion is that Indian Harbor used the absence of the Known Conditions Document Schedule as a means to manage the risk associated with a historically contamination-ridden piece of property. Lancer Ins. Co. v. Marine Motor Sales, Inc., 924 N.Y.S.2d 160,162(2011) (explaining that when a court interprets an insurance policy it must consider “the reasonable expectation and purpose of the ordinary businessman”); see also LaBrecque v. Parsons, 74 Mass.App.Ct. 766, 768 (2009) (noting a party may not rest on “conclusory statements [and] general denials” in opposing a motion for summary judgment). Therefore, Indian Harbor was within its rights to refuse coverage of the Denied Claims and summary judgment is appropriate for Indian Harbor on Count I.
III. Declaratory Judgment
The Superior Court may “make binding declarations of right, duty, status and other legal relations,” provided “an actual controversy has arisen and is specifically set forth in the pleadings.” G.L.c. 231A, § 1; see generally Carlton Hotel v. Abrams, 322 Mass. 201, 202 (1948) (explaining declaratory judgments). A declaratory judgment is remedial in nature; “(i]ts purpose is to remove, and to afford relief from, uncertainty and insecurity with respect to . . . rights, duties, status and other legal relations.” G.L.c. 231A, §9. Although intended to be liberally construed, a “judge has discretion to decline to grant declaratory relief if persuaded that it will not serve a useful purpose.” Everett v. Locall656, Int’lAss’n of Firefighters, 411 Mass. 361, 369 (1991).
In this case, in light of this court’s ruling on the breach of contract claim, neither uncertainty nor insecurity remains as to the extent in which Indian Harbor must indemnify or pay the expenses or costs of the plaintiffs. Granting declaratory relief will not serve a useful purpose, and accordingly, summary judgment must be granted in favor of Indian Harbor. See G.L.c. 231A, §3 (‘The court may refuse to render or enter a declaratory judgment. . . for . . . sufficient reasons . . . [which] shall be stated in the record”).
ORDER
For the foregoing reasons, the plaintiffs’ motion for summary judgment on Counts I and II is DENIED. Judgment shall enter for the defendants on Counts I and II.

Market Forge is the first named insured party on the Policy. On January 28, 2009, MF Properties was listed as an additional named insured.

VOCs are the by-products of the chemical “1,1,1,-trichloroethane. ”

Under the terms of the Policy, and the stipulation of the parties, the law and practice of the state of New York applies to questions related to the interpretation, performance and enforcement of the Policy.